IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC.,

     Plaintiff,

     v.                            Case No. 14-2262-CM

UTILITY ASSOCIATES, INC.,

     Defendant.

## MEMORANDUM AND ORDER

Plaintiff Digital Ally, Inc. is a public Nevada corporation with its principal place of business in Kansas.  Defendant, Utility Associates, Inc., is a Delaware corporation with its principal place of business in Georgia.  Plaintiff's legal claims in the final pretrial order are:  Count I: Monopolization and/or attempted monopolization violating 15 U.S.C. § 2; Count II: Bad faith assertion of patent infringement violating O.C.G.A. § 10-1-27A; Counts III and IV: False advertising violating 15 U.S.C. § 1125(a); Counts V, VII, and VIII: Tortious interference; Count VI: Defamation/libel/product disparagement; and Count IX: Trade secret misappropriation violating the Kansas Uniform Trade Secrets Act K.S.A., §§ 60-3320–3330 ("KUTSA").  Before the court is defendant's Motion for Summary Judgment (Doc. 206) and plaintiff's Motion for Partial Summary Judgment (Doc. 204).

### I.    Uncontroverted facts

The pretrial order and each party's statement of uncontroverted facts and responses provide the following facts:

The parties sell in-car video and surveillance systems.  Defendant owns U.S. Patent No. 6,831,556—the "'556 patent."  Defendant purchased the '556 patent in January 2013 when it acquired some or all of Digital Safety Technologies, Inc.'s assets.  "[T]he '556 Patent is directed to a system for capturing, transmitting, and storing potential evidentiary video and related information in mobile

environments which is transferred to a home base data repository for archival, retrieval, and evidentiary use."  (Doc. 215 at 3.)  In October and December 2013, defendant mailed letters to potential customers who were at that time customers of competing suppliers.  Letters were sent to customers of Panasonic, Coban, WatchGuard, plaintiff, and some of defendant's own customers, among others.  The letters stated:

> Utility Associates, Inc. ("Utility") is the owner of Boykin United States Patent No. 6,831,556 (the "Boykin patent") (attached).  The Boykin patent relates to mobile video surveillance systems and methods.  Utility has successfully manufactured and sold a mobile video surveillance system that is covered by the Boykin patent.  Consequently, the Boykin patent has enjoyed a high degree of commercial success, and a major mobile video surveillance system provider has already paid for a license under the Boykin patent.
>
> As your office considers the purchase of mobile video surveillance systems for its public safety operations, you should consider the consequences of purchasing such mobile video surveillance systems from third parties that are not licensed under the Boykin patent. If your office purchases mobile video systems that are covered by the claims of the Boykin patent and that are not licensed under the Boykin patent, [you are] liable for patent infringement as a result of [your] use of such infringing mobile video surveillance systems.  Infringement may subject [you] to an injunction against further use of the infringing mobile video surveillance systems and may result in an award of damages not less than a reasonable royalty, treble damages, attorney fees, and prejudgment interest.  Moreover, Utility is entitled to collect damages directly from the user of the infringing mobile video surveillance systems leaving [you] left with whatever value any indemnity from the seller of the infringing  mobile video surveillance systems might be worth if the seller does not have substantial financial resources.
>
> Therefore, in order to avoid the adverse consequences that may result from the purchase of infringing and unlicensed mobile surveillance systems, your office should consider purchasing its mobile video surveillance system needs from Utility.
>
> Sincerely, Robert S. McKeeman, Chairman and CEO.

(*Id.* at 6.)

In October 2013, plaintiff sued defendant in the District of Kansas, seeking a declaratory judgment of non-infringement.  On April 9, 2014, the court granted defendant's motion to dismiss for lack of jurisdiction.  On April 15, 2014, defendant issued a press release noting dismissal of that

lawsuit.  On June 4, 2014, defendant issued another press release stating that it was suing plaintiff for patent infringement.  In fact, defendant did not successfully file that lawsuit until June 12, 2014.  The reason the lawsuit was not successfully filed before the 12th is disputed.

On June 24, 2014, defendant's CEO, Robert McKeeman, sent a LinkedIn message to an employee of plaintiff's lender, Hudson Bay.  The message said:

> I am CEO of Utility – the company who has filed a Patent Infringement lawsuit against your borrower Digital Ally.  Will be in New York this Thursday . . . a couple of blocks from your office.  I have some free time on Thursday afternoon, and thought I would walk over and have a chat about what you plan to do with the Digital Ally assets if they default on your loan.  Let me know if you would be interested in having me stop by for a chat, and what time Thursday afternoon would work best for you – or a colleague as appropriate.  Reasonable chance your workout team will contact me sooner or later, so might as well start a dialogue now while I am in New York this week.  Best Regards, Robert McKeeman CEO Utility.

(Doc. 222 at 15.)  Hudson Bay's employee did not respond or meet with Mr. McKeeman.

Plaintiff filed a petition for *inter partes* review of all claims of the '556 patent on May 2, 2014. The Patent Trial and Appeal Board ("PTAB") found claims 1–7, 9–10, 12–25 to be unpatentable.  The PTAB declined to review claim 8 presumably based on insufficient evidence of unpatentability, and found claim 11 not unpatentable.  Defendant appealed and the Federal Circuit affirmed the PTAB's decision on January 13, 2017.  Claims 8 and 11 remain valid.

## II.    Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party moving for summary judgment has the burden to show "the lack of a genuine issue of material fact." *Ascend Media Prof'l Servs., LLC v. Eaton Hall Corp.*, 531 F. Supp. 2d 1288, 1295 (D. Kan. 2008) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986))).  Once the moving party meets this initial burden, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial."  *Id.* (citing *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587)).  The nonmovant may not rest on his pleadings or "rely on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986)); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Instead, the nonmovant is required to set forth specific facts, by referencing affidavits, deposition transcripts, or exhibits, from which a rational trier of fact could find for him.  Fed R. Civ. P. 56(c)(1); *see also Ascend Media*, 531 F. Supp. 2d at 1295 (citing *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000)).  Summary judgment is not a "disfavored procedural shortcut" —it is an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   Discussion

Defendant claims that it is entitled to summary judgment on all counts.  Regarding all claims, defendant argues that plaintiff offers insufficient evidence of any legally cognizable loss or harm, no lost customers or sales, and no basis for a damages claim, as well as additional arguments directed at each of plaintiff's individual claims.

Plaintiff moves for summary judgment on counts I (monopolization), II (bad faith assertion of patent infringement), III and IV (false advertising).  For the reasons explained below, defendant's motion is granted in its entirety and plaintiff's is denied.

### A.    Count I – Monopolization or Attempted Monopolization

Plaintiff alleges that defendant violated 15 U.S.C. § 2's prohibition against monopolization. Plaintiff claims that defendant "engaged in predatory and otherwise anti-competitive conduct with the specific intent to monopolize and with a dangerous probability of achieving monopoly power [over] the market for the sale of mobile, evidence-grade video recording devices in the United States" because (1) defendant's actions "were a mere sham designed to" interfere with and destroy plaintiff's business and ultimately to acquire plaintiff's assets; (2) defendant knew that plaintiff's products didn't violate the '556 patent when it made its "threats"; and (3) defendant's conduct generally was a "sham" intended to reduce competition and harm plaintiff in violation of federal law.  (Doc. 199 at 11.)

### 1.    Legal Standard

Section 2 of the Sherman Act establishes that it is illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . ."  15 U.S.C. § 2. Section 2 prohibits monopolistic anticompetitive conduct that harms competition.  *Auraria Student Hous. at the Regency, LLC v Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1233 (10th Cir. 2016). "The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  The elements of a § 2 claim are "(1) monopoly power in the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition."  *Lenox MacLaren Surg. Corp. v. Medtronic, Inc.*, 847 F.3d

1221, 1231 (10th Cir. 2017).  To prove a § 2 monopolization and attempt claim, plaintiffs must show

that "a defendant's conduct actually monopolizes or dangerously threatens to do so."  *Id.*  (quoting

*Spectrum Sports*, 506 U.S. at 459).  Additionally, all § 2 claims require proof of a relevant antitrust

market.  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1320 (10th Cir.

2017) (citing *Auraria*, 843 F.3d at 1232–33).

### 2.   Defendant's motion for summary judgment

#### a. Relevant market

Defendant first argues that plaintiff fails to provide proof of a relevant market.  "Because the

relevant market provides the framework against which economic power can be measured, defining the

product and geographic markets is a threshold requirement."  *Auraria*, 843 F.3d at 1244 (quoting

*Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)).  The product

market "is composed of products that have reasonable interchangeability for the purposes for which

they are produced—price, use and qualities considered."  *Id.*  at 1244–45 (quoting *SCFC ILC, Inc. v.*

*Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994)).  "The geographic market is the narrowest market

which is wide enough so that products from adjacent areas cannot compete on a substantial parity with

those included in the market."  *Id.* at 1945 (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796

F.2d 1216, 1222 (10th Cir. 1986)).  At summary judgment, conclusory allegations without supporting

evidence are insufficient to establish a relevant market.  *Golan*, 310 F.3d at 1369.

Plaintiff states that "[h]ere there can be no dispute that the 'relevant product market' consists of

in-car video recording devices capable of making audio and video recordings of 'evidentiary quality'

and used, principally, by law enforcement and other public safety agencies."  (Doc. 226 at 21.)

Plaintiff offers no citation to the record, deposition testimony, affidavit, or expert opinion in support of

this conclusory statement.  Any expert testimony would be inadmissible in any event, due to plaintiff's failure to disclose any experts in this case.

Likewise, plaintiff declares that "the geographic market in this case consists of all 50 states and the principal cities and countries within each of the 50 states, i.e. the very entities to which Utility admittedly sent its 'threat letters' in an attempt to sell its own products to those entities."  (*Id.*)  Again, plaintiff provides no evidence supporting this claim.  Plaintiff has therefore failed to provide sufficient evidence of a relevant market and its claims fail as a matter of law.

### b. Market power

Defendant argues that plaintiff has not provided proof that defendant acquired or was dangerously close to acquiring market power.  "To demonstrate 'market power,' a plaintiff may show evidence of *either* 'power to control prices' *or* 'the power to exclude competition.'" *Buccaneer*, 846 F.3d at 1315 (quoting *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 966–67 (10th Cir. 1990)).  "[A]ppraising market power typically necessitates an examination of market share, barriers to entry, the number of competitors in the market, market trends, and other relevant considerations."  *Id.*  (noting that market share is the focal point of this analysis, and that defendant's market share must be shown in order to evaluate market power, although market share alone is not sufficient to establish market power).

Here, plaintiff provided no evidence of defendant's market share.  Plaintiff argues that it should not have to prove market share or market power, because defendant's conduct is presumed to be anti-competitive unless defendant proves otherwise.  In support of this argument, plaintiff cites a § 1 Sherman Act case involving price fixing and output limits, restraints that are ordinarily held to be per se illegal.  This authority is inapplicable to this case.  The court rejects plaintiff's argument that defendant's power to affect the market should be presumed.

Like the plaintiff in *Golan v. Pingel Enterprise, Inc.*, plaintiff has offered no evidence of market share.  310 F.3d 1360, 1369 (Fed. Cir. 2002).  Plaintiff cites no evidence suggesting how many competitors compete in the market, the strength of these other competitors, what share of the market defendant holds, or market trends.  Plaintiff claims that the '556 patent is a barrier to entry into the market, but does not describe what impact the patent has had on the market.  Plaintiff does not cite evidence that shows it was difficult for new firms to enter the market, or show that defendant had persistent or durable market power due to its ownership of the '556 patent.  *Reazin*, 899 F.2d at 968.  Because plaintiff has not provided any evidence that defendant acquired monopoly power, or came dangerously close to doing so, plaintiff's claim fails, and defendant's motion for summary judgment is granted.

### c. Exclusionary or anticompetitive conduct

Defendant argues that plaintiff provides no proof of anticompetitive conduct.  The court declines to substantively address this argument because plaintiff's claim fails as a matter of law for the reasons discussed above.  But the court notes that "sham litigation," as plaintiff refers to defendant's patent infringement lawsuit, has a very narrow definition.

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).  Only if the court finds that the litigation was objectively baseless, does the court consider the second part of the definition—subjective motivation for the suit.  *Id.* at 60–61.  Plaintiff has produced insufficient evidence that defendant's lawsuit, or the letters or press releases were objectively baseless.  Plaintiff admits defendant owns the '556 patent, and plaintiff has not proven that the information in the letters was false, or that the lawsuit was objectively baseless.  Plaintiff's primary argument on this subject is

that defendant should have done additional research about whether plaintiff's products infringed on the '556 patent. Although plaintiff eventually filed an *inter partes* review, and the PTAB invalidated all but two claims, defendant claims (and plaintiff provides no contrary evidence) that those two claims remain valid to this day. Even if all claims are invalid, plaintiff provides no evidence that defendant believed the patent to be worthless or unenforceable before the PTAB's decision was affirmed. Plaintiff cites testimony that "Utility CEO McKeeman believed that the '556 Patent represented an unexploited asset of substantial value, and that all in-car video systems were within the 'claims' in the patent and infringed upon it." (Doc. 199 at 5.) This evidence seems to indicate that the patent infringement lawsuit was not objectively baseless. Because there is no evidence that defendant's patent infringement lawsuit was objectively baseless, the court would not examine defendant's subjective intent in filing the lawsuit. The court will therefore not address plaintiff's argument on defendant's subjective intent.

### d. Injury

Finally, defendant seeks summary judgment because it argues that plaintiff has not shown that it suffered any injury caused by conduct violating § 2 of the Sherman Act. The court will discuss the insufficiency of plaintiff's evidence regarding damages with respect to several other claims. But for all the reasons discussed above, plaintiff's § 2 claim fails as a matter of law and the court need not address this argument. The court also will not address whether plaintiff has anti-trust standing because its claims fail on the merits as discussed above. *Buccaneer*, 846 F.3d at 1305 n.9 (explaining that antitrust standing is treated as another element for proof of an antitrust claim, rather than a precondition to bringing a claim). Defendant's motion for summary judgment is granted.

### 3.    Plaintiff's motion for summary judgment

Plaintiff also moved for summary judgment on its § 2 claim. Substantial portions of plaintiff's motion for summary judgment and response to defendant's motion for summary judgment are word for word and letter for letter identical. Plaintiff's briefing in this case consisted primarily of argumentative conclusory statements, unsupported by discussion of facts, or citation to the record. When supported at all, plaintiff's citations almost exclusively refer to its own highly controverted statement of facts, requiring the court to hunt through additional conclusory "statements of fact" for documentary evidence that ultimately did not support plaintiff's positions, all without discussing why the cited "facts" supported plaintiff's conclusory statements. The court finds it unnecessary to substantively address this motion because, for the reasons addressed above, plaintiff is not entitled to summary judgment. As this is plaintiff's motion, the facts are viewed in the light most favorable to defendant and defendant's response provides sufficient argument and evidence to survive summary judgment for many of the reasons discussed above.

Plaintiff would have to establish that it is entitled to judgment as a matter of law on every element of its Sherman Act Claim in order to prevail on its motion. And plaintiff fails to establish a relevant market, as discussed above. "A plaintiff cannot arbitrarily choose the product market relevant to its claims; instead, the plaintiff must justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Buccaneer*, 846 F.3d at 1312. "If two products share a high cross-elasticity of demand—in that an increase in the price of one product causes consumers to switch to the other, and vice versa—then those products likely are interchangeable and may properly be considered part of the same product market" *Id.* Plaintiff does not attempt to address this issue. Likewise, plaintiff fails to show that as a matter of law defendant had market power, or the dangerous probability of obtaining monopoly power in the relevant market; that

defendant engaged in anticompetitive conduct; or caused plaintiff antitrust injury. Plaintiff's motion for summary judgment is therefore denied.

### B.    Count II – Bad Faith Assertion of Patent Infringement

In the final pretrial order, plaintiff claims that defendant sent "demand letters to Digital customers threatening them with suit for patent infringement in bad faith and in violation of [GA. CODE ANN. § 10-1-27A (2014)] despite knowing that the patent was potentially invalid and not knowing whether Digital's products violated the patent." (Doc. 199 at 12.) The statute prohibits any person from making a bad faith assertion of patent infringement. GA. CODE ANN. § 10-1-771(a) (2014). The statute defines "demand letter" as "a letter, e-mail, or other written communication asserting or claiming that the target has engaged in patent infringement." § 10-1-770(2). It defines "target" as any person "[w]ho has received a demand letter or against whom an assertion or allegation of patent infringement has been made . . . has been threatened with litigation or against whom a lawsuit has been filed alleging patent infringement" or "whose customers have received a demand letter asserting that use of such person's product, service, or technology infringes a patent." § 10-1-770(3).

The statute contains two non-exhaustive lists of factors the court may consider as evidence that bad faith assertion of patent infringement either has or has not occurred. § 10-1-771. For the most part, these lists are opposites. For example, if the letter does not contain the patent number, contact information for the patent holder, and factual allegations describing how the target is infringing the patent, the court may consider those facts as evidence that bad faith assertion occurred. If that information is present, the court may consider it evidence that bad faith assertion has not occurred.

Additional factors listed in the statute involve whether the patent holder sufficiently analyzed a target's products before sending letters to identify how the products are covered by the patent at issue; whether targets requested additional information from the patent holder and received it within a

reasonable time; whether the demand letter demands payment of a license fee or response within an

unreasonably short time; whether the patent holder offers to license products for an unreasonable

amount; whether the assertion of patent infringement is meritless, and whether the patent holder knew

or should have known it was meritless; whether the assertion is deceptive; and whether the patent

holder previously filed or threatened to file lawsuits based on patent infringement that were either

found to be meritless or also lacked the information described in the factors.  *Id.*  The statute states that

the court may consider any other factor the court finds relevant.

### 1.   Defendant's motion for summary judgment

Defendant argues that plaintiff's claim fails for several reasons: (1) because the statute does not

cover acts occurring outside the state of Georgia; (2) because the statute went in to effect July 1, 2014,

defendant argues that the statute does not apply retroactively to the letters defendant sent in 2013 and

January 2014; (3) because the letters do not constitute "demand letters" as defined by the statute; (4) to

the extent that the Georgia statute does not require evidence of subjective and objective bad faith, it

must do so to be in accord with federal patent law; and (5) because plaintiff has shown no evidence of

injury.

The court declines to address the parties' arguments about whether the statute applies to actions

in Kansas, because summary judgment is appropriate for several other reasons.

### a. Whether the statute applies retroactively

Defendant is entitled to summary judgment on its second argument, that the state statute does

not apply retroactively and that therefore the letters sent before July 1, 2014 are not actionable.

Plaintiff does not directly respond to this argument except to offer a conclusory declaration that "while

[the statute] became effective on July 1, 2014, Utility's October, 2013; December, 2013; and January

2014 letters may be used, nevertheless, to establish a violation thereof."  (Doc. 226 at 32.)  But

plaintiff does not give any legal justification for applying the statute retroactively.  The court interprets plaintiff's response as a concession that the statute does not apply retroactively, and an argument that the court may still consider defendant's actions prior to the statute's enactment as evidence of bad faith.  The court agrees if this is plaintiff's position.  The court will consider defendant's actions prior to July 1, 2014 where the factors allow the court to consider a defendant's former actions as evidence of bad faith.  However, defendant is not liable for bad faith assertion of patent infringement based on any letter it sent prior to July 1, 2014, because the statute was not yet effective and there is no evidence before the court that the statute was intended to apply retroactively.   Therefore, defendant's motion for summary judgment is appropriate with respect to any letters sent before July 1, 2014.

### b. Whether defendant's letters are "demand letters"

Third, defendant suggests that its letters are not "demand letters" as defined by the statute because they do not assert patent infringement, mention plaintiff or plaintiff's products, or identify any other infringing products.  Instead, defendant submits that it was exercising its right under federal patent law to inform potential infringers of its rights under the patent, to warn them that they might be infringing, and the risks associated therewith.

The court agrees that plaintiff has not shown that the letters defendant sent were "demand letters" as defined by the statute.  Plaintiff's response consists of conclusory statements, such as, "as the facts show" and "[t]here can be no dispute that" defendant's mailings are "demand letters" under the Georgia statute.  (Doc. 226 at 31.)  To the contrary, the court finds that the letters do not fall under the statute at all.  They do not claim that any entity is currently liable for patent infringement.  They merely suggest that recipients consider investigating whether products they are purchasing fall under the claims of the patent, and that if so, recipients investigate whether their supplier is licensed or needs

to be.  The letters also inform recipients that if they do purchase unlicensed products that fall under the patent's claims, they will be liable for infringement.

Plaintiff's unsupported suggestion that "Digital and the actual or potential Digital customers who received" the letters interpreted them as threats of suit is insufficient.  Plaintiff does not discuss or cite to any record evidence that supports this statement.  The evidence plaintiff does cite indicates out the exact type of evidence plaintiff could have obtained to prove its case.  For example, there is no deposition testimony or any affidavit from any entity that received one of defendant's letters explaining that the entity felt it was being threatened with a patent infringement suit or that it decided not to do business with plaintiff because of defendant's letters.  Although plaintiff does offer the testimony of its own employees, suggesting that letter recipients contacted both plaintiff and defendant seeking more information or expressing concerns after they received letters, the testimony generally describes those contacts as inquiries about whether plaintiff was licensed under the patent, or whether plaintiff had some reason it didn't need to be.  Such testimony is hearsay or hearsay within hearsay in some instances and therefore inadmissible.  Defendant's motion for summary judgment is therefore granted on plaintiff's bad faith assertion of patent infringement claim.

### c. Whether defendant acted in bad faith

Fourth, defendant argues that plaintiff must show that the letters were sent with subjective and objective bad faith in order to conform to Federal Circuit case law.  Defendant does not suggest that federal patent law preempts state law, but only that the state law must still require a showing of bad faith.

The Federal Circuit in *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 896 (Fed. Cir. 1998), explained that the propriety of notices like the one defendant sent in this case

> depends on patent law and the patent issues to which the notice pertains.  National uniformity, in confluence with the national scope of the patent grant and the general

federal exclusivity in patent causes, require that determination of the propriety of [defendant's] actions in giving notice of its patent rights is governed by federal statute and precedent and is not a matter of state tort law.  Thus in *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336, (Fed. Cir. 1998) the court observed that "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith."

*Id.*  The court also noted that "a competitive commercial purpose is not of itself improper, and bad faith is not supported when the information [in the notice] is objectively accurate."  *Id.* at 897.  "A patentee has the right to inform a potential infringer of the existence of the patent, whereby the recipient of the information may adjust its activities, perhaps seek a license, or otherwise act to protect itself."  *Id.*  Sending notices can prevent an entity from later asserting a defense of lack of knowledge in a patent infringement case based, for example, on induced patent infringement.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

To support its argument that plaintiff cannot provide sufficient evidence of bad faith, defendant cites plaintiff's first factual contention in the final pretrial order: "Utility CEO McKeeman believed that the '556 Patent represented an unexploited asset of substantial value, and that all in-car video systems were within the 'claims' in the patent and infringed upon it."  (Doc. 199 at 5.)

Plaintiff offers no argument regarding the case law defendant cites, discussing only the factors listed in the state statute.  As set out above, the factors in the state statute are intended to show whether defendant made a bad faith assertion.  They address certain characteristics of notices that a court may consider evidence for or against a finding of bad faith.  Plaintiff's arguments, construed liberally, do indirectly address bad faith.  But they fail to address defendant's arguments about its rights under federal patent law.

Plaintiff lists various actions it claims are evidence of bad faith.  The court will discuss each factor that is potentially relevant to this case, addressing plaintiff's arguments as necessary, but the

court notes that the factors are set out as recommendations and that no one factor conclusively dictates finding for or against plaintiff's bad faith assertion claim.

### i.   Patent number, contact information, and factual allegations

Defendant's letters, if the court were to consider them demand letters, include the patent number, and defendant's contact information, but they does not include "factual allegations concerning the specific areas in which the target's products, services, and technology infringe the patent or are covered by the claims in the patent." § 10-1-771(1)(A)–(C).  Plaintiff claims that this is evidence of bad faith.

The court might agree if the court found that defendant's letters were demand letters, considering the lack of factual allegations describing specific infringing products as evidence of bad faith.  But the court finds there was no reason for defendant to do research about whether individual letter recipients were purchasing products covered by the patent, because the purpose of the letter was to inform recipients of defendant's rights under the patent and to try to win their business.  Recipients were not creating infringing products or services.  They were potential purchasers of defendant's products.  Defendant was attempting to expand its place and visibility in the marketplace by informing potential buyers that it had a valuable patent covering the type of products defendant sells and that defendant believed recipients might wish to purchase.  It is true that defendant's letters leave the factual investigation to recipients, but the letters also contained defendant's contact information so that recipients could contact defendant for more information.

### ii.   Pre-mailing analysis

The second factor also could be construed as evidence of bad faith if the court were to find the letters at issue to be demand letters.  Prior to sending the letters, it does not appear that defendant analyzed each recipient's products, services, and technology to identify specific

areas where they were covered by the '556 patent.  Again, this factor would more appropriately

fit with the scenario where a patent holder sent demand letters to a competitor, not a potential

customer.   Defendant is competing for a portion of the mobile video surveillance system

market, so it sent its letters to potential buyers of that type of system.  It would be reasonable to

consider this factor evidence of bad faith if defendant had sent a letter to plaintiff suggesting

that plaintiff needed a license under the patent, requesting that plaintiff purchase a license or

risk being sued.  Likewise, it could be evidence of bad faith if defendant had required recipients

to pay a license fee or risk being sued.

### iii.     Responsiveness to inquiry and fee or response demands

Plaintiff provides no evidence that defendant failed to provide information to recipients

who asked for it, within a reasonable time.  The letters do not demand payment of a license fee

or any kind of response.  Defendant does not offer to license the patent to recipients.  Instead,

defendant offers to sell recipients its own products—further evidence that defendant was trying

to expand its customer base.  Even if the court were to find defendant's letter a demand letter,

the weight of the factors so heavily weighs towards a finding of no bad faith assertion,

plaintiff's claim would fail.

### iv.     Merit, deceptiveness, prior meritless suits or threats

Plaintiff claims that the letters were meritless or that defendant should have known that they

were meritless.  In support of this argument, plaintiff cites to the various examples of letters in the

record, and general testimony about the mailings.  As mentioned before, the letters did not mention

plaintiff and they were not targeted at plaintiff's customers exclusively.  They were sent to a broad

range of potential customers across the country.  Plaintiff cites no evidence that defendant knew or

should have known that the patent was invalid.  To the contrary, plaintiff's statement of uncontroverted

facts in the pretrial order establishes that "Utility CEO McKeeman believed that the '556 Patent represented an unexploited asset of substantial value, and that all in-car video systems were within the 'claims' in the patent and infringed upon it."  (Doc. 199 at 5.)

### v.    Other factors

Plaintiff seems to admit that defendant's letter is not a demand letter by citing statement 121 in its uncontroverted facts.  That paragraph claims that defendant admitted that the letters were not accusing plaintiff or any of its customers of infringing on the '556 patent at all but that they were sales letters.  (Doc. 205 at 28.)  Plaintiff's argument that that defendant sent these letters, specifically targeting plaintiff, alleging that plaintiff violated the '556 patent is contrary to plaintiff citing evidence that defendant believed the letters did not allege infringement at all and were in fact just advertisements.  Plaintiff's arguments are inconsistent with each other and unpersuasive.

Plaintiff makes some general argument speculating about what defendant's true purpose was in sending the letters, suggesting that it was improper for defendant to send the letters with the intent to derive commercial benefit therefrom, either by gaining plaintiff's clients, to damage plaintiff's business, or to acquire plaintiff's assets.  As stated by the Federal Circuit in *Mikohn*, "a competitive commercial purpose is not of itself improper, and bad faith is not supported when the information is objectively accurate."  165 F.3d at 897.  Plaintiff does not explain why, if defendant had a competitive purpose when sending the letters, the court should interpret this action as evidence of bad faith.  It seems likely that the letters were sent, at least in part, for a competitive purpose.  Defendant had acquired a competitor's assets, including the '556 patent, believed that it covered the type of product sold by defendant and plaintiff, and wanted to inform potential customers of its rights.  What plaintiff fails to do is sufficiently

show that any information in the letters was not accurate or provide any other admissible evidence that the letters were sent in bad faith.

Plaintiff supplemented the record with the PTAB's decision finding claims 1–7, 9–10, 12–25 to be unpatentable.  But the PTAB also declined to review claim 8 and found claim 11 not unpatentable.  Claims 8 and 11 remain valid.  Even if all the claims had been found unpatentable that would not, without more, have been evidence of bad faith.  But it does show some justification for defendant's belief that the patent had value.

Plaintiff has not provided sufficient evidence that defendant's letters were demand letters under the state statute or that defendant sent letters in bad faith.  Defendant's motion for summary judgment on this claim is granted.

### 2. Plaintiff's motion for summary judgment

Plaintiff also filed a motion for summary judgment on the bad faith assertion of patent infringement claim.  After a legal standard addressing the history of bad faith patent infringement claims, the propriety of state law impacting patent rights, and preemption, plaintiff's argument is nearly a duplicate of its response.  Although plaintiff does present a more in depth legal analysis, the only factual argument plaintiff makes is the exact same bullet pointed list that the court found insufficient in its discussion above.  Because all facts would be taken in the light most favorable to defendant on this motion, the court finds that plaintiff's motion cannot succeed where its response to defendant's motion did not, especially where they contain the same arguments.

Plaintiff does discuss remedies, including the conclusory allegation that "Digital has suffered millions of dollars in injury of the kind [the state statute] is intended to prevent, as well as incalculable damage to its name, reputation and commercial prospects.  In support, plaintiff cites paragraphs 132–170 of its statement of uncontroverted facts.   Plaintiff does not discuss this evidence in its argument or

argue why it proves plaintiff's damages.  Plaintiff leaves all of that analysis to the court's conjecture.

Paragraphs 132–170 cite to plaintiff's CFO, Treasurer and Secretary Thomas Heckman's Declaration

(Doc. 205-16), and exhibits J, K, L and M, which were supposed to be attached to the declaration

(exhibits K, L, and M were in fact not attached), Mr. Heckman's videotaped deposition testimony

(Doc. 205-15), as well as his testimony at the hearing on plaintiff's motion for preliminary injunction

(Doc. 205-14).   Also cited is plaintiff's 30(b)(6) representative and CEO, Stanton Ross's Declaration

(Doc. 205-48).

### a. Mr. Heckman's declaration

Mr. Heckman's declaration states that Traverse City was (at the time of the declaration)

plaintiff's customer.  The statement claims that Traverse City received one of defendant's letters and

emailed plaintiff asking whether plaintiff was licensed under the patent.  Plaintiff claims those exhibits

are attached to the declaration as exhibit K.  But the last exhibit attached is exhibit J.  The declaration

claims that Traverse City believed the letter to be directed at plaintiff and told plaintiff "that it could

not process a purchase order for Digital Ally's products" because of the letter.  (Doc. 205-16 at 4.)

Even if the court had access to these emails and could verify that they say what plaintiff says they do,

all of this testimony is hearsay.  The fact that the exhibit with the emails was not attached, and the

court did not locate it elsewhere in the record, makes it hearsay based on a self-serving declaration.

Mr. Heckman's declaration goes on to discuss a deal with the City of Valdosta that was

likewise allegedly disrupted due to defendant's letters.   Defendant states that the City of Valdosta

"became concerned about the threats" in defendant's letter and "immediately reached out to Digital

Ally and expressed concerns with the alleged infringement . . . and being dragged into a lawsuit."

(*Id.*)  Mr. Heckman's statement claims that the City of Valdosta delayed their purchase and "began

reviewing whether they wanted to continue with the purchase . . . in light of the threats from Utility."

(*Id.*)  Like Exhibit K, this information was supposed to be attached as Exhibit L, but it was not.  Again, these statements are self-serving hearsay and inadmissible.

Finally, Mr. Heckman's declaration discusses alleged losses due to investor's concerns.  Plaintiff's statement of uncontroverted facts is supported only by Mr. Heckman's declaration because the only exhibit cited—Exhibit M—was not attached.  Mr. Heckman stated, for example, that "[m]any investors were concerned," plaintiff's "stock price took a noticeable, marked dive," and that "[t]hough many factors can impact the value of a stock, the timing of Utility's letters to Digital Ally's customers and concern of investors lead Digital Ally to believe that Utility's letters were a significant component of the devaluation of its stock."  (Doc. 205-16 at 5.)  Again, this is a self-serving declaration.  Any testimony regarding what shareholders said is hearsay and is inadmissible.

### b. Mr. Heckman's testimony at the preliminary injunction hearing

Mr. Heckman's hearing testimony references a schedule Mr. Heckman prepared showing plaintiff's quarterly results from September 30, 2012 through December 31, 2014.  Mr. Heckman testified that he created the report to "see what effect [defendant's letter writing campaign] had on plaintiff's finances.  (Doc. 205-14 at 7.)  Mr. Heckman went on to state that he believed that the report showed that three of plaintiff's four worst quarters corresponded to defendant's mailings.

Defendant objected to plaintiff's statement of uncontroverted fact regarding Mr. Heckman's testimony as: an improper attempt to introduce expert testimony, irrelevant, speculative, and immaterial.  The court finds that the testimony is relevant to whether plaintiff was damaged by defendant's mailings.  But the court agrees that the testimony is an improper attempt to admit expert testimony.  The court previously granted defendant's motion to exclude expert testimony.  Plaintiff did not disclose any experts or reports in this case.  Plaintiff then failed to timely respond to defendant's motion to exclude any subsequently disclosed expert testimony.  In deciding plaintiff's motion for

leave to respond out of time, the court noted that plaintiff indicated it had no intention to introduce

expert testimony but that it intended to use Mr. Heckman's testimony to prove damages.

Fed. R. Evid. 701 allows a lay witness to give opinion testimony only if it is "(a) rationally

based on the witness's perception; (b) helpful to  clearly understand the witness's testimony or to

determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge

within the scope of Rule 702."  Rule 702 on the other hand allows

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or
> education [to] testify in the form of an opinion or otherwise if . . . [it] will help the trier
> of fact to understand the evidence or to determine a fact in issue . . . the testimony
> is based on sufficient facts or data . . . [it] is the product of reliable principles and
> methods; and . . . the expert has reliably applied the principles and methods to the facts
> of the case.

The court finds that Mr. Heckman's testimony is inadmissible under Fed. R. Evid. 701, because it is

based on specialized knowledge and should have been disclosed under Rule 702.  The advisory

committee notes clarify that the rule is broadly phrased to include "skilled witnesses."  "The fields of

knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but

extend to all 'specialized' knowledge."  Fed. R. Evid. 702 advisory committee's note to 1972 proposed

rules.  The committee explained that "the scope of the rule [includes] not only experts in the strictest

sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called

"skilled" witnesses, such as bankers or landowners testifying to land values."  *Id.*  To prove damages in

this case, Mr. Heckman would be using his specialized knowledge and experience as an accountant to

testify about whether plaintiff's lower revenues were caused by defendant's mailings.  Mr. Heckman

should have been disclosed as an expert, he should have drafted a report containing his opinions and

this should have been provided to defendant.  The court already granted defendant's motion to exclude

plaintiff's expert testimony.  Therefore any opinion testimony from Mr. Heckman based on his

experience and training as an accountant is inadmissible and therefore not considered on a motion for summary judgment.

### c. Mr. Heckman's deposition testimony

Mr. Heckman's deposition testimony is very similar to his declaration.  It describes Mr. Heckman or other plaintiff employees hearing about client's concerns after receiving defendant's letters.  It also includes Mr. Heckman's opinion testimony about plaintiff's stock prices, and how shareholders drove Mr. Heckman "crazy for weeks."  Again, all testimony regarding what other entities said or communicated to plaintiff is inadmissible hearsay from a self-interested witness.

### d. Mr. Ross's declaration

The cited portions of Mr. Ross's declaration provide that plaintiff has hundreds of shareholders including most of plaintiff's employees.  It also states that defendant's actions, complained of in this case, caused plaintiff's stock to decline instantaneously and significantly, ultimately resulting in a more than thirty percent loss in share price.  (Doc. 205-48 at 4.)  There is no documentary support of this claim.  If the stock prices were so clearly impacted, plaintiff needed to hire an expert, follow the federal rules for using expert testimony, and introduce the reports of that expert to prove it.  Mr. Ross's declaration testimony is insufficient and would be inadmissible expert testimony.  For all of the reasons discussed above, plaintiff's motion for summary judgment on the bad faith assertion of patent infringement claim is denied.

### C.      Counts III & IV – False Advertising

Both parties move for summary judgment on Counts III & IV.  Plaintiff claims that defendant violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by sending plaintiff's customers letters that contained false, deceptive, and unfair advertisements and press releases.  In support of this argument, plaintiff suggests that defendant's letters and press releases falsely claimed that plaintiff's products

infringed on the '556 patent, falsely portrayed plaintiff's financial position, and falsely stated that defendant had sued plaintiff for patent infringement.

The purpose of the Lanham Act is to prevent unfair competition. 15 U.S.C. § 1125(2). The Act exposes to civil liability, anyone

> who, on or in connection with any goods or services . . . uses in commerce any. . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities . . . of his or her or another person's goods, services, or commercial activities.

Section 1125(a)(1). To state a claim for false advertising under the Lanham Act, plaintiff must show that:

> (1) defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Sally Beauty Co. v. Beautyco, Inc.*, 304 F.2d 964, 980 (10th Cir. 2002). Additionally, "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1352 (Fed. Cir. 1999) (quoting *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed. Cir. 1998)). Plaintiff must prove the additional element of bad faith to succeed on any claim of false advertising based on defendant's statements publicizing the '556 patent.

### 1.    Defendant's motion for summary judgment

Defendant argues that plaintiff has provided insufficient evidence to prove elements one (materiality, falsity, and whether any statements were made in connection with commercial advertising or promotion), three, and four, and that plaintiff fails to address bad faith regarding any allegedly false representation.

### a. Bad faith

Plaintiff's only response to defendant's argument that bad faith is a required element in this case is that "[a]s it has been drafted and as it has been interpreted, § 43(a) requires no 'scienter'." (Doc. 226 at 40.)  However, the law defendant cites interpreting the statute does require a showing of bad faith when a patent holder is advertising their patent.  It appears to the court that this is the type of suit prohibited by *Zenith* and related cases.  182 F.3d at 1353.  *See also Mikohn Gaming Corp. v. Acres Gaming, Inc.*,165 F.3d 891, 897 (Fed. Cir. 1998) ("[C]ommunications to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication."); *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) ("[P]atentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction."); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 709 (Fed. Cir. 1992) (holding that a patent holder "that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers"); *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38 (1913) ("Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal."). Plaintiff cites no law to the contrary, does nothing to distinguish this case from those cited by defendant, provides no argument addressing bad faith, and in fact states that no "scienter" is required. The court finds that where, as in this case, a patent holder distributes information asserting their rights under their patent, a plaintiff must show that the distribution was undertaken in bad faith in order to succeed on a Lanham Act or tort cause of action.  *See Fisher Tool Co. v. Gillet Outillage*, 530 F.3d 1063, 1068 (9th Cir. 2008).

Plaintiff suggests that defendant's failure to analyze whether plaintiff's products violated the '556 patent is evidence of bad faith.  The court does not find this argument persuasive.  Plaintiff produces no evidence that the mailings targeted plaintiff individually; in fact, plaintiff's own briefing acknowledges that the letters defendant sent were very broad.  They target any seller of "mobile video surveillance systems and methods."  Plaintiff cites no authority suggesting that patent holders are required to investigate whether all prospective infringers of their patent in fact infringe, before sending out notices that they own the applicable patent and intend to enforce their rights under it.  Such a requirement would be nonsensical.  Because plaintiff fails to argue that defendant acted in bad faith when asserting its rights under the '556 patent, it fails as a matter of law to assert a claim under the Lanham Act against defendant.  Defendant's motion for summary judgment is granted as to plaintiff's false advertising claims.

Even if plaintiff had shown bad faith, its claims fail for additional reasons.  The majority of plaintiff's response addresses whether defendant's letters and press releases were made "in connection with the commercial advertising or promotion of its product."  But the court need not reach this analysis, because plaintiff does not support the other elements of its claims.

### b. Falsity

For example, plaintiff has not shown that statements in defendant's letters were false.  Plaintiff generally claims they "informed anyone who owned or was thinking about buying Digital products that if they continued to use or purchased and attempted to use those products, they could be liable to Utility for patent infringement; they could be sued . . . [and] they could be made to pay all of Utility's attorneys' fees."  (Doc. 226 at 40.)  Plaintiff's name is not mentioned in the letters.  Defendant's letters informed recipients that it owns the '556 patent, which relates to "mobile video surveillance systems

and methods," includes some puffery regarding the commercial success of the patent, and warns the recipient that they should "consider the consequences of purchasing [products] from third parties that are not licensed under the Boykin patent." (Doc. 215 at 6.) It warns that the recipient will be liable for patent infringement if it buys unlicensed products, potentially subjecting the recipient to an injunction and/or damages. The letter then suggests the recipients can avoid any adverse consequences by purchasing from defendant. As discussed above, plaintiffs bringing Lanham Act claims must show bad faith in cases where a defendant is advertising its ownership of a patent and representing that using covered products without a license is patent infringement. *Fisher Tool Co*, 530 F.3d at 1068. The types of statements defendant made in its letters do not subject it to liability absent a showing of bad faith. Bad faith aside, plaintiff has not shown that the statements were false. Plaintiff argues that the statements were false because defendant had not determined that plaintiff's products infringed on the '556 patent or determined that if they did, plaintiff or its customers would be liable for patent infringement. Again, plaintiff cites no authority suggesting that defendant was required to make these determinations. The letters did not specifically refer to plaintiff. They were sent to potential customers across the country. As a result, any claim for false advertising based on plaintiff's letters is unsupported by evidence of falsity and summary judgment is appropriate.

Plaintiff also claims that the press releases contain false statements. First, plaintiff discusses the April 15, 2014 press release. Plaintiff claims that defendant's statements about plaintiff's financial ability to pay a judgment and plaintiff's statements suggesting that plaintiff should have purchased the '556 patent itself, or at least obtained a license to avoid infringing on the patent, are false because defendant did not investigate whether plaintiff's products in fact infringed.

Defendant's statements about plaintiff's finances and plaintiff's ability to pay any judgment against it are not false. Defendant cites to authority in the press release, such as Securities and

Exchange Committee filings and plaintiff's own conference calls.  Plaintiff does not cite evidence

contradicting defendant's statements about plaintiff's financial situation.  The statement plaintiff

apparently objects to is, "[s]o [defendant was] concerned that collecting a judgment resulting from a

potential successful counter-suit might be in question."  (Doc. 109-3 at 2.)  Plaintiff does not explain

how defendant's expression of its concern about whether it could collect on a judgment is a false

statement.  Plaintiff did not provide any evidence that defendant did not have concerns, and any

reasonable person reading the press release would recognize defendant's statement as more similar to

an opinion than a statement of fact.  Likewise defendant's statement that "[p]erhaps Digital Ally could

have purchased the Boykin '556 patent before we purchased it for a considerable sum, but they did

not" is not a statement that can be proved true or false.  It is simply an opinion about what plaintiff

might have been able to do.  Defendant's motion for summary judgment regarding any claim for false

advertising based on the April 15, 2014 press release is granted for this additional reason—failure to

show that it contained false or misleading statements of fact.

Plaintiff claims that the release issued June 4, 2014, falsely misrepresents that defendant filed a

patent infringement suit against plaintiff.  Whether defendant had filed a lawsuit at the time the press

release issued is contested.  Viewing the facts in the light most favorable to plaintiff, defendant had not

successfully filed suit at that time.  But even if the court finds that defendant made a false

misrepresentation in the June 4, 2014 press release, plaintiff does not address the third and fourth

elements of a false advertising claim.  Plaintiff does not explain how the statement that a lawsuit had

been filed was "either likely to cause confusion or mistake as to (a) the origin, association or approval

of the product with or by another, or (b) the characteristics of the goods or services" or how that

misstatement injured plaintiff.  This is especially the case because defendant incontrovertibly sued

plaintiff, at the very latest, by June 12, 2014—eight days after defendant's press release issued.

Plaintiff does not explain how defendant's claim that it sued plaintiff is material, especially because the lawsuit was in fact filed within eight days.

Plaintiff claims that where a statement is false on its face, the court does not require evidence of damages, citing a case from the Second Circuit.  However, the case citation plaintiff provides leads to a case from the Seventh Circuit that has nothing to do with false advertising.  After tracking down the "Second Circuit case," which turned out to be a case from the United States District Court for the Southern District of New York, the court finds it distinguishable.  The district court in that case found that where "a plaintiff demonstrates the literal falsity of an advertisement, consumer deception is presumed. . . . Furthermore, injury may be presumed when the plaintiff is an obvious competitor with respect to the misrepresented product." *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp.2d 436, 450 (S.D.N.Y. 2012).  The court declines to presume injury here.  There was no misrepresented product at issue.  Instead, the misrepresentation involved defendant's claim that it had sued plaintiff.

Plaintiff also cites Tenth Circuit's decision in *General Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 686 (10th Cir. 2015) suggesting that where false statements are made willfully the court can presume the statements caused injury.  It is true that the Tenth Circuit assumed for the purposes of deciding that case, that a court *may* infer damages "in comparative advertising cases where money damages are sought and where there exists proof of willful deception." *Id.* (quoting *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir. 1997)).  But the Tenth Circuit also specifically declined to decide whether that is a correct statement of the law, this is not a comparative advertising case, and plaintiff cites no evidence of willful deception.  To the contrary, the only evidence provided seems to indicate a genuine mishap with the filing system in the District of Georgia or some inadvertent failure to complete filing by defendant.  The court therefore declines to infer damages in this case.  Plaintiff provides no evidence that defendant's misstatement that it had sued

plaintiff at the time of its press release caused plaintiff injury, especially because it did in fact sue plaintiff within eight days of the release.  Defendant's motion for summary judgment is therefore granted for this additional reason.

### c. Injury

Plaintiff also fails to provide sufficient evidence of injury caused by defendant's statements. As with many of plaintiff's claims, any evidence that defendant's actions damaged plaintiff is minimal if it exists at all.  The only evidence of injury plaintiff provides is the deposition testimony and declaration of plaintiff's own CFO, Treasurer, and Secretary, Thomas Heckman.  Mr. Heckman's testimony claims that plaintiff lost prospective sales from two prospective clients—Traverse City and the City of Valdosta, Georgia—as a result of defendant's actions.  The testimony also establishes that Mr. Heckman never spoke with anyone at either company.  He speculates about which of plaintiff's other employees or former employees who would have communicated with customers because "[t]hey don't let me  [contact clients directly].  I'm in accounting."  (Doc. 205-15 at 11.)   Mr. Heckman refers to a letter from Traverse City that expressed concerns and requested a response from plaintiff about whether it was licensed under the '556 patent.  That letter was not cited, or to the court's knowledge, provided.  In any event, if there were a letter requesting information about whether plaintiff was licensed under the '556 patent or needed to be, does not prove that plaintiff lost that bid or if it did, that it did as a result of defendant's actions.  Mr. Heckman's testimony does not even conclusively establish that a deal did not go through with Traverse City or the City of Valdosta.  He says "I don't think it ever has" gone through and he gives the name of the sales person who was working on that deal.  (*Id.* at 2.)  Mr. Heckman's testimony regarding other alleged lost deals is similar. Mr. Heckman specifically states that he is not aware of any specific deals that plaintiff lost to defendant.  (*Id.* at 3.) In sum, all of Mr. Heckman's testimony on this topic is hearsay.

For purposes of summary judgment, affidavits and deposition testimony are a permissible form of evidence because the affiant may be produced at trial to testify.  It is well known that "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  Any inadmissible hearsay statements contained within affidavits or depositions must therefore be disregarded by the court.  As the Supreme Court stated in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990), Fed. R. of Civ. P. 56(e) requires that judgment be entered for the moving party "unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial."  The Supreme Court noted that the purpose of Rule 56(e)'s requirement "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. . . . [it is] to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues."  *Id.*  Plaintiff's employee's affidavits contain self-serving hearsay statements.  Mr. Heckman's testimony provided the names of individuals plaintiff could have deposed. The testimony provides the names of business deals that allegedly went bad.  Plaintiff could have contacted those entities and requested affidavits or depositions, where they could have asked whether defendant's actions actually caused them not to purchase plaintiff's products.  Plaintiff has provided insufficient evidence that defendant's actions injured plaintiff, and the court grants defendant's motion for summary judgment for this additional reason.

Defendant's motion is granted regarding both of plaintiff's false advertising claims for failure to address the bad faith requirement and for failure to provide sufficient evidence that defendant made material false or misleading representations of fact, that were either likely to cause confusion or mistake regarding plaintiff's products or services, or to show that plaintiff was injured.

### 2.     Plaintiff's motion for summary judgment

Plaintiff also moved for summary judgment on the false advertising claims.  Plaintiff does not raise additional arguments in its motion.  In fact, it duplicated—nearly if not completely verbatim—the arguments it made in response to defendant's motion.  As in plaintiff's response, the argument focuses on the first element's requirement that plaintiff prove that defendant made material false or misleading representations of fact in connection with the "commercial advertising or promotion" of its product.  As mentioned above, the court considers additional factors to determine whether defendant made statements in connection with "commercial advertising or promotion."  Even more so in relation to plaintiff's motion for summary judgment than it was in relation to defendant's, the court need not reach this analysis, because plaintiff has not shown that it is entitled to summary judgment on the other elements of its false advertising claims as discussed above—especially viewing the facts in the light most favorable to defendant.  Because the court already addressed the substance of plaintiff's arguments above, it will not do so again.

The court will briefly address one argument that it did not discuss in relation to defendant's motion for summary judgment.  Plaintiff relies on a recent Supreme Court case, *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), for the claim that "should the Court have any remaining doubt as to the propriety of summary judgment on this claim, [the case] should alloy [sic] it."  (Doc. 208 at 39.)  The court disagrees with plaintiff's argument.  The Supreme Court case involved a toner cartridge supplier suing the manufacturer of components used to remanufacture cartridges for false advertising in violation of the Lanham Act.  *Lexmark Int'l, Inc.*, 134 S. Ct. at 1383–85.  But the issue before the Supreme Court was whether the plaintiff had standing to sue because it was not defendant's

direct competitor, so there was an extra step to show it was injured by defendant's statements. The Supreme Court specifically stated that although plaintiff "alleged an adequate basis to proceed under § 1125(a), it cannot obtain relief without *evidence* of injury proximately caused by Lexmark's alleged misrepresentations.  We hold only that Static Control is entitled to a chance to prove its case." *Id.* at 1394.  It did not hold, as plaintiff claims, that "when a patent holder has sent letters to most of the customers of a competitor falsely advising those companies that it was illegal to deal with the competitor for reasons of patent infringement, the competitor can in fact assert a cause of action against the patent holder under" the Lanham Act. (Doc. 208 at 40.)  The Court did not substantively address a Lanham Act Claim at all, especially not at the summary judgment stage.  The court finds this argument disingenuous.

Plaintiff also argues that it is entitled to remedies as a matter of law.  Because the court finds that plaintiff's claims fail, it also finds that plaintiff is not entitled to any remedies. Plaintiff's motion for summary judgment is denied as to its false advertising claims.

### D.    Counts V, VII, & VIII – Tortious Interference

Plaintiff brings three separate claims for tortious interference.  The final pretrial order supersedes all other pleadings.  (Doc. 199 at 1.)  It does not list the claims separately, it simply states:

> Utility interfered tortuously with Digital's contracts and/or reasonable commercial expectations and customer relations by approaching Digital's customers, potential customers, investors and financiers as described above and by hiring Digital former employee Eric McKee in violation of his non-compete agreement and using Digital's confidential/trade secret information (Count V, VII, and VIII).

(*Id.* at 12.)

Kansas recognizes two types of tortious interference claims: tortious interference with contract and tortious interference with prospective business advantage or relationship.  *Turner v. Haliburton Co.*, 722 P.2d 1106, 1116 (Kan. 1986).  Both types of tortious interference claims require plaintiff to

show malice.  *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004).  Defendant

argues that plaintiff fails to allege malice regarding any of its tortious interference claims.  Recent case

law from this court recognizes the interplay between the malice requirement and the "absence of

justification" element of tortious interference with contract and "intentional misconduct" element of

tortious interference with business expectancy claims.  *See Orr v. Riederer*, No.  2012 WL 2583393, at

*2 (D. Kan. July 3, 2012) (discussing *Mediware Info Sys., Inc. v. McKesson Info. Sols., LLC*, No. 06-

2391-JWL, 2007 WL 926142 (D. Kan. Mar. 26, 2007)).  Plaintiff fails to mention malice in its

response.  Summary judgment is therefore appropriate on all of plaintiff's tortious interference claims.

In an abundance of caution, and to the extent that the malice element could be considered to be

intertwined with the "absence of justification" or "intentional misconduct" elements of tortious

interference claims, the court will address the substance of plaintiff's claims, which are insufficient for

the additional reasons explained below.

### 1.      Tortious interference with business expectancy (Counts V and VII)

Presumably referring to a previous pleading, defendant suggests that plaintiffs Counts V and

VII refer to lost business expectancies resulting from defendant's letters, press releases, a LinkedIn

message, and Eric McKee's actions.  To state a claim for tortious interference with prospective

business advantage or relationship, plaintiff must show:

> (1) the existence of a business relationship or expectancy with the probability of future
> economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the
> defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably
> certain to have continued the relationship or realized the expectancy; (4) intentional
> misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate
> cause of defendant's misconduct.

*Ayres*, 345 F. Supp. 2d at 1210.  Again, plaintiff's legal claims in the pretrial order, the operative

pleading in this case, are very general.  All three tortious interference claims are mixed together

without describing which of defendant's actions allegedly exposed it to liability for which Count, and

which Counts are for tortious interference with contract and which for tortious interference with business relationship or expectancy.

There appear to be three factual circumstances on which plaintiff's claims are based.  The first involves defendant's letters and press releases that were sent to potential customers regarding the '556 patent.  Defendant argues that plaintiff has provided insufficient proof on all elements of a tortious interference claim regarding this conduct, primarily because it argues that plaintiff has not produced any evidence of a client contract or relationship that was lost due to defendant's actions.

Plaintiff also claims that defendant's LinkedIn message to plaintiff's lender Hudson Bay was tortious interference with a business relationship or expectancy.  Defendant argues that plaintiff has not shown that defendant knew of a future expectancy, that defendant acted with malice, or that defendant's actions harmed plaintiff by causing less favorable loan terms or by harming plaintiff and Hudson Bay's relationship.

Finally, plaintiff claims that Mr. McKee, as defendant's employee, interfered with plaintiff's business relationships or expectancies because Mr. McKee knew who plaintiff's customers were and tried to steal their business.  Defendant argues that plaintiff has not provided evidence that Mr. McKee knew who plaintiff's clients or contracts were since Mr. McKee had not worked for plaintiff for over a year, or that he interfered with plaintiff's business relationships with malice.  Defendant bases this argument on its argument that Mr. McKee only sold a few devices during his employment with defendant.  All were sold to one of defendant's existing customers.

### a. Malice

As mentioned above, as a preliminary matter, because plaintiff offers no argument to suggest defendant acted maliciously, summary judgment is properly granted to defendant on plaintiff's tortious interference claims.  Plaintiff's response to defendant's motion focuses almost entirely on the damages

element.  As mentioned above, plaintiff never mentions malice/intentional misconduct.  And plaintiff never directly discusses any other element.

To the extent plaintiff makes factual assertions that could support one or more of the other elements of its claims, plaintiff makes no citation to the record, affidavits, or exhibits, except with regard to its arguments on damages.  Plaintiff cites exclusively to its own statement of uncontroverted facts.  Plaintiff's lack of citations is unhelpful.  The record in this case is voluminous and highly controverted and the court had to spend much more time than necessary reviewing the record to determine whether plaintiff's allegations were at all supported.

### b. Knowledge of the relationship or expectancy

Plaintiff does cite paragraphs 81 to 84 of its statement of uncontroverted facts to support its claim that defendant knew about plaintiff's contacts and business expectancies in Gwinnett County. (Doc. 205 at 19.)  Plaintiff attempts to cite to Ms. Cross's testimony contained in Exhibit 11.  But Exhibit 11 is either Thomas Heckman's testimony at a preliminary injunction hearing or one of defendant's letters, depending on whether plaintiff is citing to the docket or its own numbering system. Neither one is Ms. Cross's testimony.  (Doc. 205-12.)  The court did locate an excerpt of Ms. Cross's deposition (Doc 205-13), but the page and line numbers plaintiff cites do not correspond to anything in that document.  The court did not believe it proper or reasonable to search through the 570 pages of exhibits attached to plaintiff's statement of uncontroverted facts to try to find evidence to support plaintiff's arguments.  The court finds that plaintiff has cited no evidence to support its argument that it had a business relationship or expectancy in Gwinnett County or that defendant knew of it.

### c. But for defendant's actions were relationships likely to continue

Plaintiff cites paragraphs 151 to 155 of its statement of uncontroverted facts, claiming that they show that a "customer, like so many others, wanted to know if Digital was licensed under the Boykin

patent or if it had some reason why it didn't need to be" (Doc. 226 at 51) and claiming that the same

thing happened with the City of Valdosta, Georgia (*Id*).  These paragraphs of plaintiff's uncontroverted

facts again cite to Thomas Heckman, plaintiff's own CFO, Treasurer and Secretary's deposition

testimony.  Plaintiff claims that Mr. Heckman's testimony shows that plaintiff received communication

from Traverse City and Valdosta, Georgia, expressing concerns about defendant's letters and

cancelling orders because of them.  Mr. Heckman's testimony is based entirely on hearsay or exhibits

to which plaintiff does not cite.  When asked, "Did you ever speak to anyone at the Traverse City

Police Department?" Mr. Heckman responded "I did not speak with them, but I was made aware of

their calls and concerns regarding the letter, and that they had, in fact, stopped purchases of our

product because of that."  (Doc. 205-15 at 2.)   Mr. Heckman explained that Greg Dyer told him about

the problems with Traverse City.  But Mr. Heckman did not remember how many or which products

Traverse City was supposed to have purchased, and he didn't think the sale ever went through, but he

could "query it in GP" to find out, noting that he had not done so for a while.  (*Id.*)  The deposition

transcript references two unidentified documents that are not otherwise provided.  It also attributes two

statements to a Lisa Green.  "Unfortunately, I cannot process your PO for the new camera until I hear

back from you on this matter," and "[w]e received the attached letter a few weeks ago, and our

attorney would like to know if your company is licensed under the Boykin Patent or if you have a

reason why you don't need to be . . . ."  Mr. Heckman then speculates about what he thinks other

people would have done to respond to Ms. Green's concerns.  Mr. Heckman again states that he has no

idea whether Traverse City wound up purchasing an in-car video system from anyone.  When asked

whether plaintiff lost any sales to defendant, Mr. Heckman responded: "I'm not aware of anything

specific because, you know, I don't think [defendant] even had an in-car system that worked back then,

so I don't know that there was even an available alternative that Utility could even supply at least."
(*Id.* at 3.)

Mr. Heckman's testimony relating to Valdivia City, Georgia is similar. The testimony refers to what was apparently Mr. Heckman's own declaration. The declaration appears to have been a narrative, claiming that Valdivia City was concerned about "being dragged into the lawsuit" and "delayed their purchase through Digital Ally and began reviewing whether they wanted to continue with the purchase of Digital Ally's products in light of the threats from Utility." (*Id.* at 4.) Mr. Heckman then stated that a sale to Valdosta did not go through to his knowledge, that he did not know who they eventually bought from, or if they even did. Plaintiff only offers Mr. Heckman's testimony to support its arguments. Plaintiff does not cite any e-mail or first-person testimony describing either Traverse City or Valdosta's concerns. Plaintiff did not cite deposition testimony of the actual sales representatives or city representatives who might have had first-hand knowledge of these concerns.

### d. Damages

Lastly, plaintiff cites paragraphs 162, 164 and 165 to establish that plaintiff incurred damages as a result of defendant's letters and press releases. Specifically, plaintiff claims that a $2.2 million contract was sitting on the desk of a long-time plaintiff customer and that this order was abandoned following defendant's mailings. These paragraphs again refer to Mr. Heckman's deposition (*Id.* at 9–11). Mr. Heckman's testimony establishes that he is in accounting, that he has not quantified the damages plaintiff claims it has incurred as a result of defendant's letters, but that he believes he could do so by contacting the clients who allegedly canceled orders due to defendant's mailings. He testified that:

> There was a $2—$2.2 million PO that got – shelved from Gwinnett County, specifically because of this. We had an order from Clarkston, Georgia shelved because of this. Traverse City, Valdosta, We've had – he had a number of – of individual opportunities there that went dead around that time, and probably because your client sent these

letters, a threat to them. . . . As I recall, state of Mississippi Highway Patrol went dead on us. State patrol in South Dakota went dead on us. Fargo, North Dakota went dead on us. Cincinnati, Cleveland, Detroit, Lansing, all these things. Now, I'm not saying that all of them were a direct result of this, but it sure as heck didn't help when they got a letter from – from an unknown supplier claiming Digital Ally infringes on their product and infringes on their patent, and they're in a competitive bid situation. I think the obvious results of that are out there, and you're seeing them right here. . . . Gwinnett, we had the PO. PO was written, sitting on the desk. They pulled it back, $2.2 million specifically because of this stinking letter that your client wrote to them, and Clarkston, Georgia, same thing. They had a PO sitting on the desk. They pulled back and withheld from us, and we never got it. So, I mean, if you want me to go quantify all these, I can. It would be millions . . . .

(*Id.*) Mr. Heckman testified that he had not contacted any of these clients, but that "Greg Dyer, Spencer Crane. Potentially Stan [Ross]" would have spoken to them. (*Id.*) He speculated about which of plaintiff's employees would have contacted the clients plaintiff allegedly lost, but reiterated that he is an accountant and that his job was not to contact or speak to clients. Plaintiff does not cite any documentary evidence of these lost deals, does not provide the testimony of the individuals who would have allegedly spoken to the lost clients, or any other proof of damages. Fed R. Civ. P. 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mr. Heckman's testimony establishes that he is an accountant, but he admits that he has not calculated plaintiff's alleged damages. He admits that he does not generally have contact with clients and that he did not have contact with any of the clients who were allegedly lost as a result of defendant's mailings. Plaintiff does not provide testimony from those of plaintiff's employees who might have done so. Plaintiff's evidence is insufficient to show damages and summary judgment is therefore appropriate.

As mentioned above, plaintiff does not explain which elements of tortious interference with business expectancy or relationship it is trying to support with any of this argument or testimony. The court finds that the deposition testimony of Mr. Heckman is also insufficient to support elements two–

four.  Plaintiff provides no evidence that defendant knew plaintiff had a business expectancy or relationship with any of the entities Mr. Heckman mentions.  Mr. Heckman admits that he cannot say that except for defendant's mailings, plaintiff would have gotten those contracts.  To the contrary, Mr. Heckman describes some prospective clients as being engaged in a bid situation, where they were considering bids from various companies.  Plaintiff cites to no documentary evidence of the POs that were allegedly sitting on the desks of prospective clients and plaintiff does not provide testimony from the sales people who were working on those contracts.  Mr. Heckman does not explain how he knew there were POs sitting on desks waiting to be sent out.  Even if this evidence was sufficient, as mentioned above, plaintiff provides no evidence of malice or intentional misconduct by defendant.

Finally, even though Mr. Heckman claims to estimate plaintiff's damages in the millions of dollars, he admits that he has not calculated them.  Discovery is over and this matter is before the court on a motion for summary judgment.  Plaintiff's evidence is self-serving and only generally describes the losses plaintiff allegedly incurred, without providing sufficient evidence that those losses were intentionally and maliciously caused by defendant's mailings.  The Federal Rules require more.  Evidence presented by a party hoping to survive summary judgment must be "based on personal knowledge and set forth facts that would be admissible in evidence."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  Because plaintiff has not provided sufficient evidence from which a trier of fact could reasonably find for it on its tortious interference claims, summary judgment is granted on Counts V and VII.

### 2.      Tortious interference with contract (Count VIII)

Plaintiff's Count VIII presumably relates to an alleged breach of Mr. McKee's employment agreement and non-compete agreement.  To state a claim for tortious interference with contract, plaintiff must show:  "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional

procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." *Id.*
Defendant argues that plaintiff cannot provide sufficient evidence on elements 3, 4, or 5. Defendant
also argues that plaintiff waived its right to enforce the non-compete agreement when it knowingly,
and without objection, allowed Mr. McKee to work for Visual Pro 360, another competitor, prior to
Mr. McKee's employment with defendant.

### a. The contract

The first element is whether there was a contract. Mr. McKee's Employment Agreement is a
part of the record (Doc. 222-12). Regarding the second element, whether defendant had knowledge of
the contract, plaintiff generally refers to Ms. Cross's testimony at the preliminary injunction hearing
held April 21, 2015, which plaintiff claims "appear in Digital's Appendix as Exhibit 11." (Doc. 226 at
50.) No record citation or pincite was provided. The court located an appendix that is part of
plaintiff's response to defendant's statement of uncontroverted facts, a separate filing from plaintiff's
response brief. The court could not find Ms. Cross's TRO Hearing testimony contained in an "Exhibit
11" anywhere in the record. The appendix attached to plaintiff's response to defendant's statement of
uncontroverted facts does contain "Christine Cross TRO Hearing Transcript." (Doc. 222-16.) But it is
exhibit 16 in the court's filing system and it is labeled Exhibit 63 by plaintiff. That document is 106
pages long. As mentioned above, plaintiff did not provide a page range or pincite to the portion of Ms.
Cross's testimony it references.

### b. Knowledge

Ms. Cross testified that Mr. McKee told her on three separate occasions about his non-compete
agreement with plaintiff, and provided her with a copy before he was hired. She testified that she had
discussions with Jason Blair, Ted Davis, and Bob McKeeman, three of defendant's top executives,
regarding Mr. McKee's non-compete agreement, and that they decided to ignore it. "I was at the office

. . . Mr. McKeeman said both, proceed with the hire and let them [plaintiff] sue us, then let them burn through some cash." (Doc. 222-16 at 87–88.)  Ms. Cross was a Vice President at defendant's company at the time.  The court therefore finds that plaintiff has produced sufficient evidence to survive summary judgment regarding the second element – defendant's knowledge of the non-compete agreement.

### c. Procurement, lack of justification, damages

Defendant challenges plaintiff's ability to prove elements 3–5.  The only authority plaintiff cites in its response is its own response to defendant's statement of uncontroverted facts paragraph 63. (Doc. 222 at 19.)  Plaintiff's argument does not directly address specific elements of a tortious interference with contract claim.  Instead, except for two references to paragraph 63, it just makes unsupported claims about defendant's alleged conduct.  Plaintiff's response to defendant's statement of uncontroverted facts, paragraph 63 cites excerpts from Mr. Ross, plaintiff's 30(b)(6) representative's, deposition; excerpts from Mr. McKee's deposition; and a letter from Mr. McKee to Mr. Schafer.

Mr. Ross's deposition testimony is a single statement involving hearsay.  When asked what evidence plaintiff had that Mr. McKee took a customer list, Mr. Ross responded, "What we have is existing customers that have contacted us that he, once he was with Utility, that he had contacted them and tried for sell Utility's products to them."  (Doc. 216-12 at 12.)  Plaintiff does not provide affidavits or deposition testimony from these "existing customers" that allegedly contacted plaintiff.

Mr. McKee's deposition testimony establishes that he worked for both plaintiff and defendant as well as at least two other competitors, that he worked for plaintiff from around January 2008–July 2012; and that he worked for defendant for about eight months—from January 2014–September 2014—as a regional sales manager for Wisconsin, Iowa, Missouri, Illinois, Indiana, Michigan, and Ohio.  Mr. McKee also testified that while the vast majority of his career involved selling in-car video

systems; that was not what he did for defendant.  In fact, Mr. McKee testified that he only sold around ten units (or fewer) to a police or public safety organization near Chicago.

The letter details Mr. McKee's Midwest Territory Plan (Doc. 222-9).  It discusses Mr. McKee's goals and plans for his sales region in 2014.  This evidence does not show that defendant intentionally procured the breach of Mr. McKee's non-compete clause.  It does nothing to address the absence of justification element.  Therefore, plaintiff has failed to make any argument that defendant acted with malice and summary judgment is appropriate.

Even if plaintiff had addressed the other elements, Mr. Ross's testimony regarding the hearsay statements of unnamed "existing clients" is not sufficient to show damages.  Plaintiff cites no affidavit, exhibit, or testimony of an "existing client" showing that plaintiff lost a contract or client to defendant.  Plaintiff instead relies on its own 30(b)(6) representative's vague reference to past contacts from such clients, without providing any proof of such contacts or clients.  Plaintiff provides no evidence of malice, that a breach occurred, that defendant procured a breach, or that plaintiff was damaged thereby.  Summary judgment must therefore be granted on Count VIII, plaintiff's tortious interference of contract claim regarding Mr. McKee's non-compete agreement.

### E. Count VI – Defamation

Plaintiff claims that defendant defamed and libeled it, its business and products "by sending false and misleading letters to customers and potential customers and by issuing false and misleading press releases."  (Doc. 199 at 12.)

Kansas law defines defamation as "false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed."  *Fisher v. Lynch*, 571 F. Supp. 2d 1230, 1233 (D. Kan. 2008) (citing *Hall v. Kan. Farm Bureau*, 50 P.3d 495, 504 (Kan. 2002)).

Defendant claims that it is entitled to summary judgment on plaintiff's defamation claim because plaintiff cannot prove falsity or harm to reputation.

Generally, defamation claims cannot be based on opinion or hyperbole. *Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A.*, 26 P.3d 1284, 1287 (Kan. Ct. App. 2001). Opinions cannot form the basis for a defamation claim unless they "allege[] undisclosed defamatory facts as the basis for the opinion." *Ross v. Rothstein*, No. 13-2101-JWL, 2014 WL 1385128, at *8 (D. Kan. Apr. 9, 2014) (citing the Restatement (Second) of Torts § 566 (1977)). This is because an opinion cannot be proven true or false.

The Kansas Supreme Court in *Gobin v. Globe Publishing. Co.*, 649 P.2d 1239, 1243 (Kan. 1982) held that:

> in this state, damage to one's reputation is the essence and gravamen of an action for defamation. Unless injury to reputation is shown, plaintiff has not established a valid claim for defamation, by either libel or slander, under our law. It is reputation which is defamed, reputation which is injured, reputation which is protected by the laws of libel and slander.

Plaintiff must therefore prove actual damage to its reputation. It is insufficient to claim general damage to reputation. There appears to be some difference in interpretation among judges in this court about what plaintiff is required to show to prove actual damage or injury. It is clear, however, that general damage to business reputation is not enough. *See Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1266, 1271–72 (D. Kan. 2012) (quoting *Woodmont Corp. v. Rockwood Ctr. P'ship*, 811 F. Supp. 1478, 1484 (D. Kan. 1993)).

The court need not address what a plaintiff is required to show in this case, because plaintiff does not offer any evidence in support of its defamation claim. Plaintiff's argument completely lacks citations to the record, exhibits, or evidence of any kind. It is comprised of conclusory statements and argument, generally referring to three events: (1) defendant telling

-44-

customers that they should buy defendant's products, implying that plaintiff's products infringed on the '556 patent; (2) defendant's press release suggesting that plaintiff should have bought the '556 patent or a license to use it, and that defendant would have sued plaintiff if it thought plaintiff had the funds to pay damages; and (3) defendant's press release from June 4, 2014, stating that defendant had sued plaintiff for patent infringement.   Plaintiff does not describe any damage or injury to reputation that it incurred as a result of these statements. Plaintiff merely claims that defendant's statements were false without citing to any evidence contradicting them.  While a plaintiff might be able to proceed to summary judgment on minimal evidence, the court cannot allow plaintiff to proceed without citing any.

As the court mentioned above in its discussion of false advertising, the statements plaintiff discusses are, with the exception of the press release claiming defendant had sued plaintiff for patent infringement, not false.  The letters do not mention plaintiff, and in fact refer to all mobile video surveillance systems sellers not licensed under the '556 patent.  The second statement, regarding whether plaintiff should have purchased the '556 patent or a license under it, does not consist of facts.  If anything, it is conjecture or opinion.  The same applies to defendant's comments about why it decided not to file a counter-claim against plaintiff in the prior District of Kansas lawsuit before Judge Crow.  Taking the facts in the light most favorable to plaintiff, defendant did make a false statement in its April press release when it stated it had sued plaintiff.  But plaintiff does not explain how this statement is defamatory.

It is well established that it is the nonmoving party's burden "to set forth specific facts, by referencing affidavits, deposition transcripts, or exhibits, from which a rational trier of fact could find for him." *Ascend Media*, 531 F. Supp. 2d at 1295.  When a party fails to properly support or address a fact, the court may grant summary judgment if, after reviewing the motion

and supported materials, the court finds that the movant is entitled to it.  Fed. R. Civ. P.

56(e)(3).  Plaintiff provides the court with insufficient evidence to support the elements of

falsity and harm to reputation on its defamation claim.  Defendant's motion for summary

judgment is therefore granted.

### F.      Count IX – Trade Secret Misappropriation

"Misappropriation occurs when there is acquisition of a trade secret by improper means or

when there is improper disclosure or use of a trade secret by another without express or implied

consent." *Vasquez v. Ybarra*, 150 F. Supp. 2d 1157, 1172 (D. Kan. 2001) (quoting *Curtis 1000, Inc. v.*

*Pierce*, 905 F. Supp. 898, 902 (D. Kan. 1995)).

Defendant claims that it is entitled to summary judgment on plaintiff's trade secret

misappropriation claim because plaintiff cannot identify a trade secret that defendant misappropriated

or any harm from any such misappropriation.  The court agrees that plaintiff has not shown any

financial damage as a result of any alleged misappropriation.

K.S.A § 60-3322 provides that a plaintiff may recover:

> actual loss caused by misappropriation and the unjust enrichment caused by
> misappropriation that is not taken into account in computing actual loss.  In lieu of
> damages measured by any other methods, the damages caused by misappropriation may
> be measured by imposition of liability for a reasonable royalty for a misappropriator's
> unauthorized disclosure or use of a trade secret.

Plaintiff does not address defendant's argument that summary judgment is appropriate based on

plaintiff's failure or inability to show damages.  Plaintiff makes no claim of actual damages relating to

its misappropriation claim.  It makes no argument and cites no affidavit or other evidence supporting a

claim for damages it incurred as a result of defendant's alleged misappropriation.  It is appropriate for

this court to grant summary judgment where plaintiff puts forth no evidence that it suffered damages as

a result of misappropriated trade secrets.  *See Tank Connection, LLC v. Haight*, 161 F. Supp. 3d 957,

965 (D. Kan. 2016) (citing *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1028–30 (Utah 2015) (noting that "Federal and state courts have unanimously interpreted the UTSA's list of forms of damages to be exclusive and have therefore required plaintiffs to show evidence of damages in one of [the categories enumerated in the statute]")).

### 1.  Improper acquisition or disclosure

Even if plaintiff had attempted to show damages resulting from trade-secret misappropriation, its claim would still fail because it does not provide evidence that any misappropriation occurred. According to plaintiff, defendant's (and plaintiff's) former employee Mr. McKee, misappropriated its trade secrets because when he left plaintiff's employ and started working for defendant, he "had access to and knowledge of a variety of Digital's confidential, proprietary and trade secret information." (Doc. 226 at 44.)  Plaintiff cites to paragraph 72 of its response to defendant's statement of uncontroverted facts for support.  Paragraph 72 cites plaintiff's 30(b)(6) representative Stanton Ross's deposition testimony for the proposition that defendant's Vice President Ms. Cross told plaintiff that McKee gave plaintiff's "confidential information" to defendant.  Mr. Ross's deposition testimony does not provide sufficient evidence to support this claim.  "To survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (quoting *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir 1995)).

When asked "what evidence do you have that McKee gave any of this type of information to someone else after he left [plaintiff's employ]," Mr. Ross responded "Oh, outside of – well the information – all I've been shown is the stuff from Criss's testimony."  (Doc. 209-12 at 23.)  Mr. Ross does not expand on the content of Ms. Cross's alleged testimony.  And plaintiff does not provide the

court with evidence of the contents of the statements or testimony Ms. Cross allegedly gave to that effect. Plaintiff's brief claims that Ms. "Cross testified that she learned of these non-public/secret product features from McKee (RSF, ¶ )"; but plaintiff does not provide a paragraph number or any other record cite to support that assertion. Plaintiff has not provided any evidence that trade secrets were misappropriated.

### 2. Identifying a trade secret

Additionally, the court finds that plaintiff did not sufficiently identify a trade secret. K.S.A. 60-3320(4) defines trade secret as:

> [I]nformation, including formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Plaintiff's assertions and definitions of "trade secret information" are very broad, encompassing everything from "knowing" about plaintiff's "confidential proprietary and trade secret information" to "names and identifies of former, existing and prospective customers," contracts with those customers, sales, product development plans, and marketing information. (Doc. 226 at 44.) But plaintiff never identifies which of these broad categories, or what specific information, was actually divulged.

Plaintiff states that defendant "possess[e]d and produced specialized data regarding" plaintiff's products, Mr. McKee admitted that the product information would not have been published by plaintiff, and that this information was not publically available. (Doc. 226 at 44.) In support of these assertions, plaintiff cites its response to defendant's statement of uncontroverted fact paragraph 64. (Doc. 222 at 20.) Paragraph 64 cites Mr. McKee, Mr. Davis, Ms. Cross, and Mr. Ross's 30(b)(6) deposition testimony.

It appears that the "specialized data" are spec sheets that defendant produced during discovery and that plaintiff asked defendant's employees to identify at their depositions.  Mr. McKee's testimony establishes that the sheets were labeled "Digital Ally DVM 500, 500 plus, and 750"—all models of in-car video systems that are incorporated into rear-view mirrors.  Mr. McKee testified that plaintiff is not the only company to create this type of product but that plaintiff was the first to do so.  Mr. McKee's testimony also establishes that the information in these spec sheets is in fact published by plaintiff, contrary to plaintiff's assertion.  Mr. McKee was asked "So Digital itself publishes that material?" to which Mr. McKee replied affirmatively.  (Doc. 222-8 at 17.)  Regarding some specifications, Mr. McKee responded that this information would not be found in Digital's published specs, instead, he suggested that the information would require testing the product to understand how it works or by asking (presumably one of plaintiff's representatives).

Neither Mr. McKee nor Mr. Davis's testimony establishes a specific trade secret that defendant misappropriated.  For example, the testimony does not establish that the information on the spec sheets was confidential.  Defendant's reply sets out a list of public websites including YouTube, Blutube (powered by policeone.com), and plaintiff's own website that publicize plaintiff's products' specifications.

Mr. Davis's deposition testimony establishes that defendant, to his knowledge, did not reverse engineer plaintiff's products and that he did not recognize the spec sheets or know why the specifications listed were what they were.  Again, this does not establish that defendant wrongfully obtained or possessed plaintiff's trade secrets, or establish what these alleged trade secrets were.

When asked what information Mr. McKee allegedly took when he left plaintiff's employment, Mr. Ross testified:

> No, he did not – he did not take blueprints [or a design for a new product] but he had knowledge of features that we were coming out with . . . . Often our products are built

such that they have a lot of capabilities within them.  An example, an easy one would be like our – our body cameras, you know, have – had Wi-Fi in them virtually day one, but that feature wasn't activated until the software and the other I want to say surrounding support could be put in place.  So that's also the way it was with some of our other products, you know, whether it be the 750 or even, you know, the 800s.  We had products that had the hardware in place, and as the software and these other features were going to be able to come on, we could update them just literally by people getting – you know, getting online and doing – downloading it.  So some of these features, he clearly knew what they were prior to them being introduced.

(Doc. 222-3 at 18–19.)  General knowledge gained while working in an industry is not a trade secret.

*Bradbury Co., Inc. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1229 (D. Kan. 2006).

When asked what evidence, if any, plaintiff had that Mr. McKee told anyone about this "knowledge," Mr. Ross replied, "From what I've been shown, not a lot.  What I've been told is that yes, he said that we were going to be coming out with other products and even Criss Cross had indicated, I believe, that there were features, new features. . ." (*Id.* at 19.)  Ms. Cross's cited deposition testimony establishes only that she was defendant's vice president for sales and marketing.  Plaintiff does not provide any of Ms. Cross's testimony or anyone else's that further explains what she allegedly told Mr. Ross.  The sum of this deposition testimony does not explain or prove what trade secrets Mr. McKee provided to defendant, if any.

Elsewhere in the briefing, plaintiff generally alleges that Mr. McKee interfered with plaintiff's customers and attempted to get them to switch to defendant's products.  But plaintiff does not argue, and support with evidence, that defendant or Mr. McKee misappropriated a list of customers that was otherwise not publicly available in order to take away plaintiff's business.  Defendant provided an exhibit showing plaintiff's website that lists plaintiff's contracts by state.  Where a customer list is not kept confidential or is easily compiled by a third party, such list is not considered a trade secret.

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d. 1057, 1066 (D. Kan. 2001).  Plaintiff provides no argument or evidence suggesting that defendant or Mr. McKee

misappropriated a confidential client list that would be entitled to protection.  Defendant's motion for summary judgment is therefore granted as to Count IX, trade secret misappropriation.

### VII.    Conclusion

Defendant's motion for summary judgment is granted as to Count I, plaintiff's Sherman Act claim, because plaintiff did not provide sufficient evidence to establish a relevant market or defendant's market power, and defendant is therefore entitled to judgment as a matter of law.

Defendant's motion is granted as to Count II plaintiff's claim for bad faith assertion of patent infringement, because plaintiff provided insufficient evidence that the letters defendant sent out were "demand letters" as defined by the statute, that the letters were sent in bad faith, or that plaintiff was injured by those statements.

Defendant's motion is granted as to counts III and IV for false advertising under the Lanham Act because plaintiff did not provide sufficient evidence on elements one, three, and four of its claims.

Defendant's motion for summary judgment on plaintiff's tortious interference claims, Counts V, VII, and VIII, is granted because plaintiff cites insufficient evidence to survive summary judgment on these claims.  Plaintiff does not provide evidence to support elements two–five of its tortious interference with business expectancy or relationship claim.  With regard to its tortious interference with contract claim, plaintiff does not show intentional or malicious procurement of breach, the absence of justification, or damages.  Plaintiff did not provide sufficient evidence that defendant intentionally procured a breach of Mr. McKee's non-compete agreement, failed to address the absence of justification element, and provided insufficient evidence of damages resulting therefrom.

Plaintiff's defamation claim, Count VI, fails because plaintiff's response brief cites no specific facts, by reference to affidavits, deposition transcripts, or exhibits, from which a rational trier of fact could find for it.

Regarding Count IX for trade secret misappropriation, plaintiff's claim fails because it provided no evidence of damages resulting from misappropriated trade secrets, and even if plaintiff had provided evidence of damages, it provided insufficient evidence that any trade secrets were misappropriated or even what the alleged trade secrets were.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 206) is granted in its entirety.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Partial Summary Judgment (Doc. 204) is denied.

This case is closed.

Dated this 30th day of March, 2017, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**